OPINION
On June 16, 2000, James E. Washington was indicted by a Franklin County grand jury on one count each of domestic violence and having a weapon while under a disability ("WUD"). The domestic violence count carried a specification alleging that Mr. Washington had a firearm in his possession while committing the offense. In addition, the domestic violence count also alleged that he had previously been convicted of negligent assault involving a victim who was a family or household member at the time. The allegation of such a prior assault serves as an enhancement of the degree of the domestic violence offense; if sufficiently proven, the prior conviction enhances the domestic violence from a first-degree misdemeanor to a fifth-degree felony.
The WUD count resulted from Mr. Washington's prior conviction for cocaine possession in 1999 which prohibited him from possessing a firearm.
The indictment stemmed from an incident in June 2000, during which Mr. Washington purportedly caused or attempted to cause physical harm to a family or household member. The named victim was Rhonda Shamblin, Washington's live-in girlfriend of several years. Details of the incident are addressed below in our discussion of the second assignment of error.
A jury trial commenced on September 11, 2000. The jury ultimately rendered guilty verdicts as to all counts and specifications.
Pursuant to an entry journalized September 15, 2000, the trial court imposed two consecutive sentences of eleven months' imprisonment, plus one additional consecutive year for the firearm specification.
James E. Washington (hereinafter "appellant") has timely appealed, assigning two errors for our consideration:
First Assignment of Error
 The evidence did not establish that Appellant possessed a firearm as defined by R.C. 2923.11(B)(1).
Second Assignment of Error
 Appellant's convictions for domestic violence and having a weapon while under a disability are contrary to the manifest weight of the evidence.
Because resolution of appellant's second assignment of error requires a review of the evidence adduced at trial, we address it first. Appellant contends that his domestic violence and WUD convictions are against the manifest weight of the evidence. In addition, the substance of his argument incorporates the related concept of challenging the sufficiency of the evidence.
Preliminarily, we set forth the similar, yet distinct, standards by which we are bound in reviewing this assignment of error, challenging both the sufficiency and manifest weight of the evidence.
"The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different." State v. Thompkins (1997), 78 Ohio St.3d 380, paragraph two of the syllabus. In Thompkins, the court explained at length the distinctions between the two standards:
 With respect to sufficiency of the evidence, `sufficiency is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law.' Black's Law Dictionary (6 Ed. 1990) 1433. See, also, Crim.R. 29(A) (motion for judgment of acquittal can be granted by the trial court if the evidence is insufficient to sustain a conviction). In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law. State v. Robinson (1955), 162 Ohio St. 486 * * *. In addition, a conviction based on legally insufficient evidence constitutes a denial of due process. Tibbs v. Florida (1982), 457 U.S. 31, 45, * * * citing Jackson v. Virginia (1979), 443 U.S. 307 * * *.
When reviewing the sufficiency of the evidence to support a conviction, an appellate court must review the record to determine "whether the evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." State v. Jenks (1991),61 Ohio St.3d 259, paragraph two of the syllabus. In Jenks, the Supreme Court set forth the stringent standard of review to be applied in a sufficiency analysis:
 "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." Id.
In contrast, as explained in Thompkins, supra, a manifest weight analysis is slightly different:
 Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence. Robinson, supra, 162 Ohio St. at 487 * * *. Weight of the evidence concerns `the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief.' (Emphasis added.) Black's, supra, at 1594.
 When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the manifest weight of the evidence, the appellate court sits as a `thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony. Tibbs, 457 U.S. at 42 * * *. See, also, State v. Martin (1983), 20 Ohio App.3d 172, 175 * * * (`The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.').
Pursuant to the foregoing standards, we examine the record in a light most favorable to the prosecution to determine if the prosecution sufficiently proved beyond a reasonable doubt each element of the offenses charged, and/or whether the jury "lost its way" in convicting appellant such that a manifest miscarriage of justice occurred.
Turning now to the specifics of appellant's second assignment of error, appellant contends that the prosecution failed to prove by sufficient evidence the elements of the offenses of which he was convicted, domestic violence and WUD. As noted above, appellant concomitantly contends that the verdicts were against the manifest weight of the evidence.
Domestic violence is proscribed by R.C. 2919.25, in pertinent part, as follows:
 (A) No person shall knowingly cause or attempt to cause physical harm to a family or household member.
As indicated infra, pursuant to subsection (D), domestic violence is enhanced from a first-degree misdemeanor to a fifth-degree felony if the offender previously has been convicted of certain enumerated offenses "involving a person who was a family or household member at the time of the violation," including a violation of R.C. 2903.14, negligent assault. The record reveals that the parties stipulated that appellant was previously convicted of negligent assault in November 1999. (Tr. 67.)
Circumstances giving rise to a WUD offense are delineated by R.C.2923.13, including, as is relevant here:
 (A) * * * [N]o person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if any of the following apply:
* * *
 (3) The person * * * has been convicted of any offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse * * *.
Applying the foregoing legal standards to the facts of this case, we turn now to a review of the evidence adduced at trial.
Appellant's trial, in its entirety, consisted of three prosecution witnesses, including the alleged victim, Rhonda Shamblin. Throughout her testimony, Ms. Shamblin made it quite clear that she had no desire to testify against appellant, with whom she professes to be in love and with whom she wants to continue their long-term relationship. Edward ("Eddie") Russell, Ms. Shamblin's teenaged son, and the state's third and final witness, was similarly displeased to be subpoenaed to court.
The state's first witness was Columbus Police Officer Joe DeVictor, who was the first officer on the scene at the June 2, 2000 incident at 479 East Jenkins Avenue. Alone in his cruiser, he was dispatched to the scene based upon a 911 call "in response to a man with a gun." Since a "gun run" requires two officers, Officer DeVictor waited for a backup officer when he arrived at the scene. (Tr. 16-17.)
Officer DeVictor provided the following account of the events he observed:
 A. * * * As I was waiting for backup, that's when the female came out to the car.
Okay. And did you identify that female?
She stated that she was the one who called.
How did she appear to you?
She was irate, very upset, screaming and crying.
What did she say?
* * *
 A. She told me that her boyfriend had smacked her in the face and that he pulled a gun on her and put it in her face.
What did you do at that point?
 A. Simultaneously I got out of my car and Officer Wolfson pulled up who backed me up that day. We started to approach the house, the male was across the doorway outside and there were several steps up to the house
* * *
 I walked up to the house. I walked about four houses down and started up to approach the house.
What did you see?
 A. I saw the male come out of the house [identifying appellant.]
* * *
 * * * He was pretty excited too and he told me that I asked to see his hands because he was there with a gun and I wanted to make sure we weren't in danger. He was pretty reluctant and kind of behind his legs and I really couldn't see his hands. I asked him, I need to see his hands now. He refused. I drew my weapon. I pointed it at him.
Why did you draw your weapon?
 A. Well, I was in fear at that point. He immediately put his hands up. I reholstered. I put my hands on him. I put his hands behind his back and put them together. I was holding them with my left hand and I quickly patted him down for a weapon.
Did you find a weapon on him?
No, I did not. [Tr. 17-20; emphasis added.]
Confident that "we were at least immediately safe," Officer DeVictor then "had [appellant] sit on the stairs" in front of the residence from which he had come. He then proceeded "to find out what happened." The officer testified that Ms. Shamblin came home and found appellant to be "intoxicated," and that he "became very irate with her, smacked her in the face, pushed her a few times or something. She ran into the kitchen to get away." (Tr. 20.)
Then, according to the officer, Ms. Shamblin stated to him that she went back outside. "[Appellant] then took out a gun, I guess around his waistband or somewhere, pointed it in her face and said, what was she going to do now?" Officer DeVictor then surmised that "[s]omebody got to the phone and she somehow called the police." (Tr. 21.)
The police officers took statements from both Ms. Shamblin and her son, the specifics of which were not detailed during the officer's testimony, other than those already quoted above. Ms. Shamblin suggested that appellant had had a gun, but that the gun would not be found in the house. According to the officer, Ms. Shamblin opined that appellant might have "gotten rid of it," maybe in an outside trashcan or in the yard. Although he searched for the alleged gun, he never found one. (Tr. 21-22.)
Officer DeVictor then provided the following narrative explaining what transpired following the unsuccessful search for a firearm:
 Well, we were still at the beginning when he was * * * sitting * * * on the steps, he claimed that [Ms. Shamblin] had threatened him. At that time[,] he got up and he ran back in the house.
 And on this situation[,] that's very dangerous for us too. * * * I told him ["]do not go back in the house.["] He kept going.
 I said, ["]do not go back in the house.["] I repeated it a second time. I ran into the house. I lost sight of him for a little bit, probably just under a minute. * * *
 He stormed back out of the house, kind of like almost a jog. He had a knife in his hand. And he was saying something about she threatened him and she threatened him with a knife. I drew my weapon again and pointed it at him.
I said, ["]put down the knife now.["]
He kept saying, ["]what are you going to do?["]
I said, ["]put down the knife.["]
 Now I approached him and my partner was behind me. I got possibly three or four feet [from] him. He dropped the knife. I immediately reholstered and I grabbed him and I handcuffed him and I put him back in the car. [Tr. 23-24.]
Officer DeVictor did not recall seeing any injuries on Ms. Shamblin. He neither called for paramedics nor deemed medical attention necessary.
On cross-examination, Officer DeVictor clarified a few points. He did not believe that Ms. Shamblin had been drinking. He directed both her and her son to write separate statements, and he believed that their statements did not contradict each other. He reiterated that Ms. Shamblin did not appear to be injured. He also added that during a typical "domestic run," photographs are supposed to be taken of any visible injury.
Rhonda Shamblin, whom the prosecution unsuccessfully attempted to have called as a court's witness, provided the following testimony during direct examination. On June 2, 2000, she was living with appellant, her "boyfriend." When she arrived home from work at approximately 4:30 p.m., she and appellant began arguing. She testified that she did not recall why they were arguing. She claimed that whatever it was about involved "minor stuff * * *, just little stuff." (Tr. 36-37.) Ms. Shamblin gave the following narrative account of the events she could recall:
 * * * When I got home from work we was arguing. I called my brother. And he said, well, he was going out and he invited me to go along so I went out with my brother. And we was out clubbing it about four, five hours, steady drinking.
 I got home and when I got home I came home. My brother had to bring me home. My brother, my niece, my son, my daughter was all in the van with us. We all got out. On the way up the neighbors the whole neighborhood was out.
 And everybody, they warned me that there was going to be that James [appellant] was mad I call him Randy but he was mad because well, they didn't say why but they said that they said he had a gun, and that he was going to scare you. He's going to * * * put the scare in you, but when I walked in the house he jumped up. [Tr. 37-38.]
Given the apparent equivocation of Ms. Shamblin and the lack of clarity in the facts at this point, the prosecution interrupted with a few questions regarding appellant's state of mind and corresponding behavior when she went in the house. Ms. Shamblin explained that appellant was "angry * * * [b]ecause he was yelling and screaming." (Tr. 38.) She added, "Because he said that my so-called girlfriend called him not once, no about three or four times called him saying, do you know where Rhonda's at? And he would say no. Yeah, because she's out with my boyfriend. That is why he was angry." (Tr. 39.)
According to Ms. Shamblin, she and appellant were both arguing, both drunk, and "up in each other's faces." Id. She was not with appellant the entire day, so she could not estimate how much alcohol he had consumed, only that "he was drunk." (Tr. 40.) The following events ensued:
 * * * We was arguing. We was really arguing. And the neighbors said that he had a gun that he was going to put to my head and scare me. I believed him. So I don't know. We was just arguing and I went on the porch and we was still arguing. I jumped in the middle of the street and we was still arguing.
* * *
 And the whole neighborhood was out and I just carried it on, carried it on. And like I told you before, I'm a drama queen. I just carried it on and on and on and he was on the step and he was calm and he was cool. He was just sitting on the step. [Id.]
Ms. Shamblin explained that even though the situation had calmed down, she called 911 because after she asked him to leave, "* * * he asked me he said call the police." (Tr. 41.) Although the 911 tape-recording[1]
contains her allegations that appellant had slapped her in the face and that she thought he had a gun, she denied these claims during her trial testimony.
Ms. Shamblin further acknowledged that she provided a written statement to the police following the incident. She claimed at trial to have forgotten what she wrote in her statement. She essentially characterized her statements at the time of the incident as exaggerations, falsehoods, and half-truths.
Ms. Shamblin emphasized that she did not see appellant with a gun. She only told the police that she did because she had heard that from a neighbor. She characterized her statements to police and the 911 dispatcher as "false." (Tr. 43-49.)
Ms. Shamblin acknowledged that she was the victim of appellant's prior negligent assault in 1999. She also acknowledged that she still loves him, wants to continue cohabiting with him, and does not want "to see him get in trouble." (Tr. 49-50.)
The state's final witness was Eddie Russell, Ms. Shamblin's son, a thirteen-year-old, seventh-grader at the time of trial. Like his mother, he expressly stated that he did not want to be in court testifying against his mother's boyfriend.
Eddie Russell testified that he saw his mother and appellant argue and heard appellant "dare" his mother to call the police. Eddie claimed that he recalled neither seeing appellant with a gun nor seeing him slap his mother.
Based upon our careful consideration of the record before us, we cannot find that appellant's domestic violence conviction was either against the manifest weight of the evidence or that it was not supported by sufficient evidence. Notwithstanding Ms. Shamblin's inconsistent and equivocal protestations to the contrary, the jury clearly acted within its purview in evaluating her credibility and assessing the facts. Given the stringent standards of review by which we are bound, the evidence in toto, including the officer's testimony and the 911 tape, established sufficient evidence upon which the jury could properly rely in reaching its guilty verdict. Furthermore, notwithstanding its rather minimal substance, the verdict was not against the manifest weight of the evidence.
However, given the state of this record, appellant's conviction for the WUD was not supported by sufficient evidence and, therefore, was necessarily against the manifest weight of the evidence. Thompkins, supra. We find that the state failed to meet its burden in establishing that appellant possessed a firearm for purposes of a conviction pursuant to R.C. 2923.13.
Accordingly, we overrule that portion of appellant's second assignment of error which challenges the evidence supporting the domestic violence conviction; however, as explained infra, the second assignment of error is sustained insofar as the WUD conviction was not supported by sufficient evidence.
Turning now to appellant's first assignment of error, he argues that the evidence was insufficient to prove that he possessed a gun for purposes of R.C. 2923.11(B)(1), the firearm specification included in the indictment.
R.C. 2923.11(B) provides as follows:
 (1) "Firearm" means any deadly weapon capable of expelling or propelling one or more projectiles by the action of any explosive or combustible propellant. "Firearm" includes an unloaded firearm, and any firearm that is inoperable but that can readily be rendered operable.
 (2) When determining whether a firearm is capable of expelling or propelling one or more projectiles by the action of an explosive or combustible propellant, the trier of fact may rely upon circumstantial evidence, including, but not limited to, the representations and actions of the individual exercising control over the firearm.
Speaking directly to the proof required in order to convict an accused charged with a violation of R.C. 2923.11(B), in Thompkins, supra, the Supreme Court of Ohio held, at paragraph one of the syllabus:
 A firearm enhancement specification can by proven beyond a reasonable doubt by circumstantial evidence. In determining whether an individual was in possession of a firearm and whether the firearm was operable or capable or being readily rendered operable at the time of the offense, the trier of fact may consider all relevant facts and circumstances surrounding the crime, which include any implicit threat made by the individual in control of the firearm. (State v. Murphy [1990], 49 Ohio St.3d 206 * * *, State v. Jenks [1990], 61 Ohio St.3d 259 * * *, and State v. Dixon [1995], 71 Ohio St.3d 608, * * * followed; R.C. 2923.11[B][1] and [2], construed and applied.)
The state failed to present sufficient evidence that a firearm was involved in this case. For the same reasons we reject the sufficiency of the evidence for the WUD charge, we similarly find the evidence insufficient for purposes of the R.C. 2923.11 firearm specification.
In summary, the second assignment of error is overruled in part and sustained in part. To the extent appellant challenges the evidence of domestic violence, the assignment of error is overruled. However, the assignment of error is sustained as to the WUD conviction and, accordingly, appellant's conviction must be vacated.
Given our disposition of the firearm-related offense challenged in the second assignment of error, the first assignment of error must be sustained. Based upon the same rationale applied above, the evidence adduced at trial did not sufficiently establish that appellant possessed a firearm. Accordingly, all firearm convictions and specifications must be vacated.
In sum, the first assignment of error is sustained, and the second assignment of error is sustained only to the extent of the WUD conviction and firearm specifications. The second assignment of error is affirmed as to appellant's domestic violence conviction. The judgment of the trial court is reversed to the extent indicated herein, and is remanded for further proceedings consistent with this opinion.
_____________ TYACK, J.
BRYANT, P.J., and DESHLER, J., concur.
[1] The transcript of proceedings indicates that the 911 tape was played for the jury, although "the audio quality * * * is poor." (Tr. 43.)